NOTICE
Decision filed 02/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230314-U

NO. 5-23-0314

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Vermilion County. |
| v. | ) ) | No. 19-CF-203 |
| NICHOLAS TRIMBLE, | ) ) | Honorable Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER[*] delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's conviction and sentence, where: (1) the trial court did not violate defendant's right to a fair trial by failing to declare a mistrial or adequately inquire of two jurors; (2) hearsay statements by victim Rafael Arvalo and witness Carina Bernal were properly admitted; (3) improper other crimes evidence was not admitted; (4) the State did not improperly shift the burden of proof during its closing arguments; (5) trial counsel did not render ineffective assistance; (6) the trial court performed an adequate Krankel inquiry into defendant's claim of ineffective assistance of counsel; and (7) the trial court properly admonished defendant regarding his right to represent himself.

¶ 2     Following a jury trial in the circuit court of Vermilion County, defendant, Nicholas Trimble, was found guilty of the murders of Rafael Arevalo and Omar Roman. Defendant raises

---

[*]Justice Welch was originally assigned to the panel. Justice Bollinger was later substituted on the panel and has listened to oral arguments and read the briefs.

seven issues on appeal. To wit: (1) that the trial court denied him his due process right to a fair trial when it failed to either declare a mistrial or adequately question two jurors who came forward indicating they were unable to further deliberate, (2) the trial court improperly admitted hearsay statements by victim Rafael Arvalo and witness Carina Bernal, (3) the trial court improperly admitted other crimes evidence in the form of previously dismissed charges, (4) the State improperly shifted the burden of proof during closing arguments, (5) trial counsel for defendant was constitutionally ineffective, (6) defendant received an inadequate *Krankel* inquiry when he raised numerous potentially meritorious claims of ineffective assistance of counsel, and (7) the trial court did not properly admonish defendant before allowing him to represent himself in posttrial proceedings.

¶ 3                                        I. BACKGROUND

¶ 4      On April 23, 2019, defendant was charged by information with the September 4, 2017, murders of Rafael Arevalo and Omar Roman. On May 2, 2019, those charges were superseded by grand jury indictments for the same offenses. Defendant was initially appointed the public defender but quickly hired private counsel, although that attorney eventually withdrew in favor of different private counsel on March 31, 2021. When that second attorney passed away prior to trial, the public defender was reappointed, although defendant eventually hired another private attorney, who first appeared on defendant's behalf on July 26, 2022. On December 1, 2022, defendant requested that a trial date be set, and a trial date was eventually set for February 21, 2023, with a final pretrial to take place on February 10, 2023.

¶ 5      On January 23, 2023, the State filed a motion asking that statements made by victim Rafael Arevalo to his boyfriend, Michael "Shane" Clark, and family members, Jesus and Miriam Rodriguez, indicating that he was planning on meeting with someone on the evening of September

4, 2017, be admitted at trial as statements of Arevalo's then existing state of mind. Over defendant's objection, the trial court allowed the State's motion, indicating it believed that the statements were statements of Arevalo's then existing state of mind under Illinois Rule of Evidence 803 (eff. Mar. 24, 2022).

¶ 6    The trial began as scheduled on February 21, 2023. On that date, a jury and two alternates were selected and opening statements were given by both the State and defendant before the matter was recessed to begin evidence the next day. The following day, the State began its case-in-chief with a stipulation laying the foundation for surveillance video from 517 Harvey Street, Danville, Illinois (517 Harvey), which was the home of both victims as well as the scene of their murders. The State did not publish any video at that time, but instead called its first witness, Detective T.J. Davis of the Danville Police Department.

¶ 7    Detective Davis testified that on September 4, 2017, he was called out to 517 Harvey, Daville, Illinois, at approximately 7 p.m. for a homicide investigation. He arrived on scene around 8:15 p.m. and did a walkthrough of the residence, observing one male victim, later identified as Omar Roman, dead on the living room couch and a second, also male and later identified as Rafael Arevalo, dead on the floor in the kitchen. He also observed several security cameras both inside and outside of the residence. Detective Davis then obtained a search warrant for Comcast, who provided the cameras and maintained copies of their video feed for 517 Harvey, as well as the cellular telephone services for the phones of each victim. The next day, September 5, 2017, Detective Davis received a link to video footage complying with his search warrant request. There were four videos, each with about 20 hours of footage. Detective Davis reviewed the footage and observed footage captured by a camera located within the living room of 517 Harvey from around 7 p.m. on September 4, 2017. Detective Davis indicated that the angle of the footage showed what

3

occurred in the living room facing the front door and showed "suspects" entering 517 Harvey and the shooting of Roman in the living room of 517 Harvey. Detective Davis also found potentially useful footage from a camera mounted to the outside of the residence and facing the roadway in front of the house. That video showed a vehicle, which matched the description of a vehicle a witness saw fleeing the scene just after hearing gunshots, traveling past the residence at 517 Harvey twice before finally stopping in front of it. The detective testified that, after reviewing them, he had taken the full, 20-hour clips and cut them down to just the relevant portions. Discs with those cut-down versions were then identified, admitted into evidence, and published to the jury. While the clip from the living room was played, the detective narrated it, identifying both Arevalo and Roman in the video, and noting that the video was in "night vision" which meant that colors were not depicted accurately. The detective further indicated that he did not recognize the two suspects depicted in the living room video shooting Roman and that it "appeared" as if one of the two suspects, a man in a hat who had gone into the kitchen with Arevalo prior to shooting Roman as he fled the house, had been "clutching something" in his left arm as he fled. Several still photographs taken from the video clips, colloquially known as screenshots, were admitted into evidence and published to the jury. Detective Davis explained how he had extracted footage from a home surveillance system for 526 Harvey, a neighboring residence where Loretta Williams, who had called 911 in response to the gunshots at 517 Harvey on September 4, 2017, lived, and a disc with that footage was admitted into evidence.

¶ 8     The State next called Carina Bernal to testify. She testified that she was friends with Arevalo and Roman, having met them both around 2009 or 2010. She considered herself to be good friends with both, and knew Arevalo's family, including his sister, Maria Prado. She also knew Arevalo to engage in the sale of cannabis out of his residence located at 517 Harvey. She

4

testified that she had first met defendant, who lived in the Champaign-Urbana area, in 2017 over social media and, during the summer of that same year, became romantically and sexually involved with him. The relationship lasted about three months, ending sometime prior to September 3, 2017, and the two saw each other once or twice a week during that period. During their relationship, the two communicated primarily through social media, including Snapchat, where defendant used the handle of "Gslicck."

¶ 9    Bernal testified that on her birthday, June 11, 2017, defendant had contacted her wanting two pounds of cannabis and she arranged for him to buy it from Arevalo. She was present for that sale, which took place on June 11, 2017, in the kitchen of Arevalo's residence located at 517 Harvey. During that transaction, Arevalo brought jars of cannabis out of his room and showed them to defendant, who pointed to the ones he wanted. Defendant left with two sealed bags of cannabis, purchased from Arevalo. Bernal testified that during that transaction, she never saw defendant touch any bags that were not the two he purchased. She also testified that on September 3, 2017, defendant contacted her wanting to arrange another cannabis purchase from Arevalo. Bernal then contacted Arevalo, telling him that defendant wanted to make another purchase, and asked that he make contact with defendant himself via Snapchat. Bernal indicated that she contacted Arevalo again the next day over Snapchat and confirmed whether he contacted defendant and would be selling cannabis to him. Arevalo responded that defendant was in St. Louis but would be back that evening around 7 p.m. Bernal testified that she understood her conversation with Arevalo to mean that defendant and Arevalo were going to meet at 7 p.m. on September 4, 2017, to complete the cannabis sale.

¶ 10    Bernal testified that she again reached out to Arevalo via Snapchat when she got off work that day around 7 p.m., asking if defendant had met with him. She received no response from

5

Arevalo, but a few minutes later received a call informing her that Arevalo and Roman had been shot. Bernal testified she immediately called and spoke to defendant, asking if he had come to Danville. According to Bernal, defendant indicated he did not, because Arevalo had indicated he had something else to do at 7 p.m. When she told defendant that Arevalo and Roman were dead, he reacted with surprise saying, "get the fuck out of here" and reiterated he had not come to Danville that day. Bernal clarified that during that call, defendant always denied having come to Danville on September 4, 2017, and never claimed to have traveled there with his new girlfriend, Justyce Newsome. During the call, Bernal indicated that she heard something that sounded like wind in the background, but when she asked what he was doing, he deflected. Bernal further testified that in the days and weeks following the deaths of Arevalo and Roman, she attempted to reach out to defendant, but could not, which was unusual behavior for him. Defendant eventually contacted her, indicating that he had accidentally run over his phone and had to purchase a new one.

¶ 11      Bernal testified that on January 10, 2018, she went to the Danville Police Department with Prado to look at some photos taken from the 517 Harvey surveillance footage. She testified she was shown the photos by Detectives Davis and Carley and did not make an identification at the time, although she recognized defendant as one of the subjects shown in the photos. She testified that she did not identify defendant at that time because she was scared. However, when she left the police department, accompanied by Prado, she told Prado that she had recognized defendant as one of the subjects depicted in the photos. She testified that she returned to the police department later that same day and spoke with Detective Carley again. He again showed her the same photos from before and this time she identified defendant as one of the subjects shown, specifically the one wearing the hat. During that meeting Bernal also told Detective Carley about the phone

6

numbers, Snapchat handles, and Facebook handles for herself and defendant. That meeting was not recorded as Bernal indicated she was too scared to be recorded. Bernal indicated that she took part in a third interview with Detective Carley on June 7, 2018. That interview was video recorded. Again, Bernal was shown still photographs from the surveillance footage from 517 Harvey and, she identified defendant as the man wearing the hat in those photos, although she noted that defendant's skin tone was darker in person than in the photos. She did not recognize the other suspect depicted. She wrote defendant's name on the relevant photos and initialed them. Those photographs were identified, entered into evidence, and published.

¶ 12    Upon cross-examination, Bernal testified that the reason she went back for the second police interview was because Prado had persuaded her that she needed to inform police of the identification. She denied that anyone had told her to specifically identify defendant in the photos. She admitted that her romantic relationship with defendant had ended and that he had a new girlfriend by the time she made her identification. Bernal denied being upset with defendant after their breakup because he had thrown out some of her clothing, instead indicating that she had told him after their breakup that he owed her $200 because she had lent him a pistol that he failed to return. Trial counsel verified that, while she had a firearm owner's identification (FOID) card at the time of trial, she did not have one when she had lent the pistol to defendant. When trial counsel further inquired about why Bernal left the pistol with defendant, she indicated that he had told her that he had an altercation with someone when he asked to borrow it. When asked, she admitted to knowing Arevalo's boyfriend, Michael Shane Clark—although she only knew him as "Shane"— but she denied ever smoking cannabis with him, Arevalo and defendant in Arevalo's kitchen. During redirect, the State further inquired about the pistol Bernal said she had lent defendant, asking if guns were how defendant took care of altercations. Bernal indicated she did not know.

7

¶ 13    Another stipulation was then read into the record, detailing the testimony of Loretta Williams. The stipulation indicated that Williams would testify that on September 4, 2017, she lived at 526 Harvey, located across the street from 517 Harvey. The stipulation indicated that Williams would testify that she believed the people living at 517 Harvey were "drug dealers and king pins" because she did not usually see much traffic at the residence, but about once a week multiple vehicles would pull up to the residence and several people would go inside, only to exit a few minutes later with backpacks. The stipulation indicated that Williams would testify that on September 4, 2017, at about 7:05 p.m., she was sitting on her front porch talking on the phone, when she heard a series of "pops" coming from the direction of 517 Harvey. She then saw two "guys" running out of 517 Harvey. The stipulation described the two as follows: "the first person she saw as a male black, who went to the driver's side of the vehicle carrying a backpack" and "the second person was a light-skinned male carrying a backpack who went to the passenger side of the same vehicle as the first male." The stipulation described the vehicle as a light gray one and indicated that a photograph of a vehicle parked in front of 517 Harvey was the same vehicle she saw. Foundation was laid for that photograph as part of the stipulation. Foundation was also laid for the surveillance video from 526 Harvey. The video was admitted into evidence and published. The 911 call made by Williams on September 4, 2017, was also admitted by agreement, and published as well.

¶ 14    Michael "Shane" Clark was called as the State's next witness. He testified that he had been the boyfriend of Arevalo at the time of his death and that they had met about five years prior to Arevalo's death. He indicated he had not known that Arevalo sold cannabis, although he did sometimes use cannabis himself. He testified that Arevalo lived at 517 Harvey, but that he did not

8

go over there much. He testified that he knew Arevalo's sister, Maria Prado, as well as Miriam and Jesus Rodriguez, who were the sister and brother-in-law of Omar Roman.

¶ 15 Clark testified that on September 4, 2017, at around 11 a.m., Arevalo picked him up at the train station in Champaign, where he was returning from a weekend trip to Chicago. They returned to Clark's residence in Danville, and Arevalo stayed with him until around 2 p.m. When Arevalo left, he indicated he was planning to meet with some friends from Champaign, and that he would be back around 6 or 7 p.m. However, around 6:30 or 7 p.m., Clark got a phone call from Arevalo indicating that his friends from Champaign were running late. Clark indicated that Arevalo never made it to his home that night, and that around 8 p.m., he received a call from Prado indicating that Arevalo was dead. Clark testified he then went to 517 Harvey.

¶ 16 Jesus Rodriguez then testified for the State. He testified that he was married to Omar Roman's sister, Miriam Rodriguez, with whom he had three children. He further testified that Arevalo was his uncle through his mother, Maria Prado. He also knew Bernal, a friend of Arevalo's. He testified that on September 4, 2017, he and his family stopped by 517 Harvey at approximately 6 or 6:30 p.m. While they were there, Arevalo indicated that he could not go out to eat with the group because he was waiting on "Carina's boy" to arrive from Champaign. Jesus testified that he and his family left 517 Harvey a short time later and went shopping. Sometime that same evening, Miriam received a phone call and they subsequently returned to 517 Harvey.

¶ 17 Miriam Rodriguez testified next. She testified consistently with Jesus about the family relationships. She also testified that on September 4, 2017, she and her family went to 517 Harvey between 6 and 7 p.m. to invite Arevalo and Roman out to eat. She testified that neither one wished to join them, and that Arevalo also specifically said that he could not go out with them because he was waiting on "Carina's boy" from Champaign, who was running late. Miriam testified that she

9

and her family left 517 Harvey and went shopping. She further testified that later that same evening, they returned to 517 Harvey after being told about the events that had occurred there. The police were present and investigating when they returned, and Miriam testified she kept in contact with the police about the status of the investigation.

¶ 18    Miriam testified that on January 10, 2018, at around 1:30 p.m., she went to the Danville Police Department and met with Detective Carley, along with her mother-in-law, Maria Prado. She testified that Bernal was also present, and that she believed Bernal arrived shortly after herself and her mother-in-law. She testified that she returned to the Danville Police Department later that same day at about 3:15. Again, she was with her mother-in-law and Bernal arrived shortly thereafter. She observed Bernal being interviewed by the police and identifying someone named Nick in photographs shown to her by the police.

¶ 19    On cross-examination, Miriam indicated that during the investigation into the deaths of Arevalo and Roman, she had brought up the name Myra Morena, who was a family member, to police because she thought that Morena might be connected to the murders. She further admitted to having probably called Morena a "bitch" over social media. On redirect examination, Miriam elaborated that she had suspected Morena of involvement in Arevalo and Roman's deaths because of rumors she heard, although she did not elaborate on those rumors.

¶ 20    Maria Prado testified next. She testified that Arevalo was her brother, that she knew Roman, and that she knew the two to be good friends. She testified that her mother owned 517 Harvey and that Arevalo lived there with their mother, and that Roman was often present there as well, although he did not live there. Prado testified that she visited frequently and when she visited, she had never seen bags of drugs laying around nor had she ever seen kitchen chairs on their sides. The last time she visited 517 Harvey was on September 3, 2017. She testified that after she found

10

out about the murders of Arevalo and Roman, she stayed in contact with police about the investigation and that on January 10, 2018, she went with Bernal to the Danville Police Station to look at some photos that officers had. She testified that when Bernal was shown the photographs, Bernal did not identify anyone but that she "gasped" and "was shocked." Prado testified that she and Bernal left the police station together and had a conversation during which Bernal had her pull up the Facebook profile for a "Nick Trimble" on her phone. After that conversation, Prado testified that she contacted officers with the Danville Police Department, told them that Bernal made an identification after they left the police station, and gave them the name of the Facebook profile. Prado testified that after that conversation, she returned to the Danville Police Department and again told them what Bernal had said regarding the identification of at least one person depicted in the photographs officers had shown them earlier. She testified she met again with police, specifically Detectives Carley and Wilson of the Danville Police Department, later that day, along with Miriam and Bernal. Prado testified she was not present for the interview of Bernal because she stepped out of the room.

¶ 21     The State's next witness was Lieutenant Kyle Butcher, a crime scene technician with the Danville Police Department. He testified that on September 4, 2017, he became involved in the double homicide at 517 Harvey. He indicated that he was involved in photographing and processing the scene, along with other officers. He further testified that he attended the autopsies for both Arevalo and Roman on September 6, 2017. As part of that process, he collected and took into evidence several bullets taken from the bodies of Arevalo and Roman. Upon cross-examination, Lieutenant Butcher indicated that multiple packages of marijuana and two firearms, one near each victim's body, were found at the murder scene.

11

¶ 22    Officer Jason Dunavan, another crime scene technician with the Danville Police Department, testified next. He testified that on September 4, 2017, he was called out to help process the double murder of Arevalo and Roman at 517 Harvey, along with other officers. A video walk-through of the crime scene was taken before it was processed. That video was admitted into evidence and published to the jury. Officer Dunavan described how items of potential evidentiary value were marked and photographed. The photographs taken during that process were admitted and published to the jury during Officer Dunavan's testimony. Several shell casings, all 9-millimeter, were found at the scene in both the living room and kitchen, and collected as evidence, as were several spent bullets and bullet fragments. Two firearms, a .40 caliber found on top of Roman's body, and a 9-millimeter found on Arevalo's, were also found. The .40 caliber found on Roman's body had a loaded magazine seated in it, but no round chambered. The 9-millimeter found on Arevalo's body was neither loaded nor had a round chambered. Officer Dunavan testified that a large amount of cash was found in the pockets of both Roman and Arevalo. A cell phone was also found with each man. The shell casings, bullets, bullet fragments, firearms, and cell phones were all admitted into evidence. Several bags of cannabis were also found in the kitchen of the residence with Arevalo's body. Two of those bags, which were later sent to the Illinois State Police Crime Laboratory for processing, including fingerprints, were admitted into evidence. More bags were found in the residence's dryer.

¶ 23    A recess was taken for the day, and trial resumed the following day with State's witness Dr. Scott Denton, a forensic pathologist. Denton determined that the cause of death for both Roman and Arevalo was multiple gunshot wounds. He recovered eight spent bullets from the body of Roman and one from Arevalo.

¶ 24    Several stipulations were then made, including one for defendant's fingerprint card, which was admitted into evidence pursuant to the stipulation. Carloyn Kersting, a retired firearms and tool-mark identification expert for the Illinois State Police Crime Laboratory then testified. She testified that she examined the fired shell casings collected from 517 Harvey and determined that they were fired by two different guns, neither of which was the gun found on Arevalo or Roman's body. She was able to determine that all of the casings found in the kitchen had been fired by the same gun, while there were casings in the living room that had been fired by both.

¶ 25    Tracy Moore, a fingerprint expert for the Illinois State Police Crime Laboratory, testified next. She examined several items collected by officers from 517 Harvey for prints. She found one print suitable for comparison on one of the bags of cannabis collected from the kitchen of 517 Harvey. She compared that print with defendant's known prints on the fingerprint card and determined that the print was a match for defendant's left pinky finger. On cross-examination, Kersting admitted that there was no way to tell when the print was left, and that it could have been left on either June 11, 2017, or September 4, 2017.

¶ 26    The State then presented several more stipulations. The first laid the foundation for account records from JD Byrider. Those records were subsequently admitted into evidence based on that stipulation. The records indicated that defendant purchased a vehicle from JD Byrider for which he had to make monthly payments. They contained defendant's address, two phone numbers, and one email as well as records of conversations employees had with defendant in August and September 2017 regarding late payments on the vehicle. Those conversations had occurred by phone on one of the two numbers the records had attached to the account as defendant's. The records indicated defendant had attempted to make a payment on the vehicle on September 6,

13

2017, but that payment was declined. When the payment was declined, defendant indicated that he had just put money on the card used for payment and would call the bank.

¶ 27    The next stipulation concerned cell phone records from Sprint, which were admitted into evidence as a result of the stipulation. Those records concerned the same phone number that JD Byrider had listed as being defendant's and used to speak to him regarding late payments in August and September 2017. The phone was a "burner phone" where no contract was required and Sprint had no records indicating who maintained service for the number.

¶ 28    The next stipulation concerned cell phone records for the phone of Arevalo from AT&T, which were admitted into evidence. Following that was a stipulation regarding employment records for Justyce Newsome, which were admitted pursuant to that stipulation. Those records included an address and phone number for Justyce Newsome. The address listed for Newsome in those records was 806 E. Seminary Street in Danville. The records indicated that she worked on September 4, 2017, from 10:08 p.m. until 6:17 a.m. the following day. Records for Newsome's cell phone were then admitted via stipulation. Those records included a phone number, which was the same number listed in the employment records for Newsome.

¶ 29    The next stipulation concerned Snapchat records, which were admitted into evidence pursuant to that stipulation. Those records concerned the usernames "gslicck," identified as belonging to defendant, "chino7791," identified as belonging to Arevalo, and "ms.ladyk," identified as belonging to Bernal.

¶ 30    After the stipulations, the State called Special Agent Jeremy Bauer of the FBI to testify. Special Agent Bauer testified that he was part of the FBI Cellular Analysis Survey Team, or CAST, which, among other things, provided historical cellular site analysis to local law enforcement. He testified that cellular site analysis could use cell phone records to determine a cell phone's general

14

location and that he had received training to perform such analysis. He was subsequently certified as an expert in the field of historical cellular site analysis and explained, generally, how that analysis was performed. Importantly, he noted that the analysis showed only the phone's location, not who was using it, and could not provide an exact location or address where the phone was located, only a general one. Special Agent Bauer explained that the analysis was based off plotting what cell phone tower a cell phone was utilizing when making a call or otherwise utilizing the cell network and then determining the general orientation of the phone to that tower by looking at which of three sides, or sectors, of the cell phone tower the phone connected with. A cell phone connected to whatever tower had the strongest signal, which usually, but did not always come from the closest tower to the cell phone.

¶ 31    Special Agent Bauer testified he had performed a historical cellular site analysis for two sets of cell phone records, one for a phone belonging to defendant and the other for a phone belonging to Newsome. Both analyses were placed on a demonstrative exhibit that was presented to the jury in the form of a map with points plotted on it. The analysis showed both phones utilizing a cell tower located in Urbana at approximately 5:05 p.m. on September 4, 2017. The face of the tower both phones were utilizing was oriented towards both the residences of defendant and Newsome, making it possible that the phones were in either or both locations. There was no activity shown for Newsome's cell phone after that during the time period Special Agent Bauer analyzed, but defendant's cell phone showed activity placing it near Danville, specifically connecting with the west-facing sector of a tower located in Batestown at 6:51 p.m., which Special Agent Bauer testified would be consistent with defendant traveling eastward towards Danville on Interstate 74 from Urbana. Defendant's phone then connected with a west-facing sector of a tower located near the interchange between Gilbert Street in Danville and Interstate 74 at 7:08 p.m. Special Agent

15

Bauer testified that this would be consistent with defendant being in the area of Interstate 74 and Bowman Avenue. The next data points for defendant's cell phone were from 7:32 p.m. and 7:33 p.m. At those times, defendant's cell phone connected with the east-facing side of a tower located just east of St. Joseph. Special Agent Bauer testified that it would be consistent with defendant traveling back from Danville to the Champaign-Urbana area. Finally, at 7:51 p.m. defendant's phone connected with a south-facing sector of a tower located in northern Urbana. Special Agent Bauer testified that it would be consistent with defendant having returned to the Champaign-Urbana area.

¶ 32    After Special Agent Bauer's testimony concluded, trial counsel informed the trial court that defendant wished to address it, which he did, outside the presence of the jury. At that time, defendant indicated that he no longer wished to be represented by trial counsel, claiming irreconcilable differences. The trial court informed defendant that it had observed competent representation up until that point and would not be removing trial counsel in the middle of the jury trial.

¶ 33    The jury was then brought back into the courtroom and Detective Patrick Carley of the Danville Police Department testified on behalf of the State. He testified that he was one of, if not the, lead detective on the investigation into the murders of Arevalo and Roman. As part of that investigation, he testified that several search warrants were executed, including for cell phone records of the two victims in the case. Detective Carley testified he went through those records as part of his investigation, noting that Arevalo had no text messages in the hours preceding his death but Roman did. Detective Carley testified that he investigated leads based on Roman's text messages, however ultimately nothing came of that avenue of investigation. Detective Carley also testified that he became aware of allegations that Roman had stolen a package containing

16

methamphetamine from a cousin who shared a child with someone in California. He investigated this rumor as a possible motive for the murders of Arevalo and Roman, first contacting the families of Arevalo and Roman in regard to it on September 5, 2017. Based on that conversation, he was given the name Myra Morena, a cousin of some sort to one or both of the deceased men. Detective Carley testified that he interviewed Morena on September 11, 2017. That interview led to other interviews and search warrants for phone and Facebook records. Ultimately, the investigation into the rumors of the stolen methamphetamine led nowhere. Detective Carley testified that other leads were investigated as well, with none of them ultimately bearing fruit either.

¶ 34    Detective Carley indicated that as part of his investigation, he had watched the video surveillance from 517 Harvey at least 50 times. The video was played again, and the detective noted the color difference between the video and real life, pointing out that while the couch appeared gray in the video, it was red in real life. Detective Carley asserted that the color change applied to skin tone as well. He testified that in watching the video, he saw the suspect in the hat come back and grab something before fleeing the house. He also testified that he did not recognize either of the suspects depicted in the video when he first viewed it.

¶ 35    Detective Carley testified that he was eventually able to put a name to one of the suspects after he spoke with Bernal. He testified that he first met with Bernal to make a possible identification on January 10, 2018, at about 9 a.m. Bernal was with Prado for that first meeting. During the meeting, Detective Carley showed Bernal still images from the 517 Harvey surveillance, but she did not identify anyone at that time. Within a few minutes of Bernal and Prado leaving the meeting together, however, Detective Wilson, who had also been present, received a call from Prado. As a result of that call, the detectives asked that Prado and Bernal come in again. Another meeting was held at 1:50 p.m. that same day, but while Prado was present, Bernal

17

was not. Instead, Prado returned with Miriam. They indicated that Bernal had not come because she was scared. They did, however, give Detective Carley a name for one of the suspects depicted in the video: defendant's.

¶ 36 A subsequent meeting was held at 3:15 p.m. that same day, and this time Bernal appeared, along with Prado and Miriam. Detectives attempted to record the interview, but Bernal refused video recording and even indicated that she was too scared to be interviewed in a room where there were cameras that had been turned off. The meeting was relocated to a room without cameras and Bernal was again shown still photographs from the 517 Harvey surveillance. This time she identified the suspect with the hat as defendant. That identification was confirmed by showing Bernal a driver's license photo of defendant. Based on information provided by Bernal, search warrants were obtained for defendant's phone records, as well as the Snapchat accounts of Bernal, defendant and the victims. Detective Carley testified that he went through defendant's phone records to see if he had spoken to Bernal the day before the murders and just after the murders occurred. The phone records corroborated statements made by Bernal during the meeting where she identified defendant. Detective Carley testified that he reviewed the Snapchat records to see whether they corroborated Bernal's statements as well. The records contained a conversation between Bernal and Arevalo where she told Arevalo to add defendant on Snapchat. There was a subsequent message wherein she asked Arevalo if he had met with defendant yet, to which Arevalo responded that defendant was in St. Louis.

¶ 37 Detective Carley also went through defendant's Snapchat records. He found no messages at all for the date of the murder, but two for both the day before and after. He did, however, find a photograph of defendant from the date of the murder. In it, defendant was wearing an orange polo shirt and hat. Detective Carley testified that defendant's facial hair was identical to that of the

18

suspect in the hat from the 517 Harvey surveillance. He also testified that the hat appeared to be the same as the one worn by the suspect, a baseball-style hat with a small, light colored design of some sort being visible on the suspect's hat that appeared to match the clearer white polo design on the Polo baseball hat worn by defendant in the Snapchat photo. That photo was admitted into evidence and published to the jury. Detective Carley also went through the Snapchat messages for Arevalo. He found no messages between defendant and Arevalo, but the messages between Arevalo and Bernal mirrored those found in the records for Bernal's account.

¶ 38    Detective Carley interviewed Bernal again on June 7, 2018. This time the meeting was video recorded. Video of both the full interview and a shorter clip of it were entered into evidence. Only the clip was published. That clip ran approximately five minutes and depicted Detective Carley showing several photographs to Bernal for identification. She identified the subject in the hat as defendant, confirmed it with a copy of his driver's license photo, and indicated she did not know the other suspect. Within the clip, she also explained how she knew defendant, indicating that they had dated in the summer of 2017. The photographs used in that identification were then admitted into evidence and published.

¶ 39    Detective Carley testified that after the June 7, 2018, interview of Bernal, he received the results from the Illinois State Police crime laboratory regarding the firearms and the identification of a fingerprint found on a bag of cannabis as defendant. Based on that and the rest of the information he gathered, he sought and received an arrest warrant for defendant. He executed that arrest warrant on April 22, 2019, arresting defendant at Assembly Hall in Champaign. A search incident to the arrest found an Apple iPhone and a blue Samsung on defendant's person.

¶ 40    During cross-examination, Detective Carley was asked about a potential motive for the murders. Detective Carley indicated he believed it was a robbery, or what trial counsel immediately

19

characterized as a "drug rip-off." Detective Carley indicated, upon questioning, that there appeared to be several thousand dollars on each victim. On recross, Detective Carley was asked outright whether it would make sense to take cash from Arevalo or Roman if the motive for the murders was robbery, to which the detective indicated that it might to a person with "bad morals."

¶ 41 After Detective Carley's testimony, the jury was sent out and a jury instruction conference was held, with some rulings reserved until after defendant's case concluded. Defendant offered no instructions during the conference. At the beginning of that conference, trial counsel addressed defendant's earlier desire to proceed *pro se* by indicating that he and his client had reconciled.

¶ 42 The following day, the State rested its case on the record and defendant began his, first calling Debra Lenard. Lenard testified that she was defendant's mother and she had never met Bernal or been aware of her relationship with her son. She did, however, know Newsome, whom she believed her son to have possibly started dating during the summer of 2016. She testified that her son had children of his own and that she had never observed him with a firearm.

¶ 43 Defendant next called Newsome to testify. She testified that she was born and raised in Danville, with several family members still living in Danville, although she had resided in the Champaign area for several years. She testified that she started dating defendant sometime in the summer of 2017 and that she had met his family, including all five of his children. She testified that in 2017, before the birthday of her deceased son, which was September 9, she wanted to make a shadow box for him as a memorial. The belongings she needed to make that shadow box were located at her grandmother's house located at 806 East Seminary in Danville, and so she needed to go to her grandmother's to gather them. Defendant agreed to go with her to make that trip. She testified that they made that trip to her grandmother's on September 4, 2017, going to her grandmother's and nowhere else. She testified that she drove her vehicle there, and that they took

20

Interstate 74 from the Champaign area to Danville, exiting the highway to go to her grandmother's via the Bowman Avenue exit and then returning to the Champaign area along the same route. She testified that they never drove down Harvey Street while in Danville.

¶ 44 On cross-examination, Newsome testified that the status of her current relationship with defendant was unclear, indicating that they had talked about marriage. She testified that she first talked with defendant about him having been with her on the day of the murders on the date of his arrest, but that, other than defendant's attorneys, she had never told anyone else this until her testimony that day. When questioned, she further testified that she had spoken to Detective Carley on the same day that defendant was arrested and that during that conversation she was told that defendant was claiming that he was with her on the day of the murders. She confirmed that she told Detective Carley that she was with defendant, specifically that she was at defendant's apartment scrolling through social media and had seen a report of the victims' murders.

¶ 45 Newsome testified that she did not remember telling detective Carley that her car was not working, nor telling him that defendant had driven over to Danville to pick her up and take her back to her apartment on that day. She also did not remember telling Detective Carley that she was going to drive defendant's car to work for her third shift employment in Paxton due to her car not working. She also did not recall being told by Detective Carley during her interview that defendant had claimed they had gone to Danville to pick up a key so they could decorate for a party. She further failed to recall replying to that by saying they'd gone to her sister's house to drop off decorations but didn't remember the exact day, because she went to Danville a lot. Upon questioning, Newsome eventually agreed that after a phone call from defendant during the interview, she broke off her interview with Detective Carley, indicating she needed to go to Walmart.

21

¶ 46     Defendant then testified on his own behalf. He indicated he had a prior 2015 conviction for "a battery." He testified that he first became Facebook friends with Bernal around 2016 and then the relationship became sexual, although he was unclear about whether he would call it "dating." He indicated that at some point, he spoke to her about obtaining cannabis through someone she knew, after a Snapchat post she made featuring what appeared to be several pounds of vacuum-sealed or Ziploc bags of cannabis. Defendant testified that at some point in 2017, Bernal introduced him to someone he knew as "Chino," and whom he later learned to be Arevalo, and a cannabis sale took place. Defendant believed the sale took place during the last week of July. For that sale, Bernal gave him Arevalo's address, 517 Harvey, and he drove there in his 2012 Buick Lacrosse. Once there, he went inside and the sale took place. Defendant testified that there were several pounds of cannabis in several packages on the table and that he opened each one to smell them in order to determine what cannabis he wanted to purchase. Once he had picked out his cannabis, Arevalo resealed the bag and he, Arevalo, and Bernal all smoked cannabis together. Defendant testified that while Bernal had been there when he arrived, the two left the residence together.

¶ 47     Subsequent to that cannabis sale, defendant testified he stopped hanging out with Bernal as much and "moved on" by dating Newsome. Defendant testified that after he began dating Newsome, Bernal became upset with him, claiming he owed her $200 for some clothes she had left at his house that he had gotten rid of. He testified that he had held onto them for several months before finally getting rid of them, but that one day after the murders she began asking about the clothes. He told her he had thrown them out, at which point she became upset. Defendant denied that Bernal ever gave him a firearm.

¶ 48     Defendant testified that he had contacted Bernal again after that initial cannabis sale, and after he had started dating Newsome, to see about brokering another cannabis sale. Those

22

conversations occurred over the phone and Snapchat. At first, Bernal indicated that Arevalo was in California. Once he returned, Bernal indicated she would have Arevalo contact defendant, which he did over Snapchat. Defendant testified that Arevalo contacted him the Thursday before his death about completing the sale. Defendant indicated he responded that he had his children that weekend and might not be able to complete the purchase during that time frame. Defendant testified that weekend was Labor Day weekend, and he had four of his children, the boys, aged from 8 to 19, with him that weekend, having picked them up on Friday, September 1, 2017, and then driving them home to the St. Louis area on Monday, September 4, 2017. Defendant testified that Arevalo was in constant contact with him over that weekend, looking to make the cannabis sale.

¶ 49      Defendant testified that after dropping his children back off in the St. Louis area, he drove with Newsome to Danville. He testified that Newsome drove the vehicle and that he received phone calls during the drive, including one at 7:08 p.m. Defendant claimed to have been on Gilbert Street in Danville at that time, pointing to the map that Special Agent Bauer had made to elucidate his testimony, where the point labeled with that call was on Gilbert Street. Defendant denied having gone to 517 Harvey on September 4, 2017.

¶ 50      With regard to the late payments on the vehicle he had purchased from JD Byrider, defendant testified that the vehicle eventually stopped working, and he abandoned the vehicle to be repossessed. Defendant was not certain when that occurred, but it was after the murders, and he believed it might have occurred in October of 2017.

¶ 51      On cross-examination, defendant indicated that in addition to Arevalo asking him about coming to Danville to complete the sale on Friday and Saturday, there had been some discussion about defendant going to Danville to complete the sale on September 4, 2017. Defendant testified that despite Arevalo asking him about coming to Danville to complete the sale, it was Arevalo who

23

cancelled the sale. Defendant claimed that Arevalo told him he had something to do, and that he should come the next day or later.

¶ 52    Defendant was questioned about his statements during his interview with police on the day of his arrest. Defendant denied that his statements on that day were substantially dissimilar from his testimony at trial, indicating that any apparent discrepancies were phrasing. As part of that confrontation, defendant indicated that he and Newsome had first gone to her grandmother's to drop off the shadow box memorial and then picked up a key as well, as part of the same transaction. Defendant denied having money troubles around the time of the murders, indicating that the late payments on his car were because he had lost his wallet and had his bank account "frozen." He testified that the reason he thought he was going to be able to make his car payment on the Tuesday after the murder, as the JD Byrider records indicated he said he would, was that he was expecting to have received a new copy of one of his cards by then. Defendant also acknowledged being told by Bernal that Arevalo had been robbed many times before but specifically stated that he did not take that to mean Arevalo would be an easy target for a robbery, because he did not rob people.

¶ 53    During cross-examination, the State impeached defendant regarding his prior conviction. The State confirmed with defendant that he had testified he had a prior battery conviction, then asserted the conviction was actually an aggravated battery to a police officer. Defendant denied ever having battered a police officer. The State later submitted a certified copy of defendant's prior conviction into evidence, which trial counsel stipulated to. That certified copy of conviction listed that conviction as "aggravated battery, harm, peace officer *** a class 1 felony."

¶ 54    After defendant's testimony, trial counsel indicated he wished to offer a demonstrative exhibit into evidence, without any testimony. The assistant to trial counsel explained the exhibit to the trial court, who summarized it as having the purpose of challenging the testimony of Special

24

Agent Bauer regarding the cell phone tower data and possible locations. Trial counsel agreed with that summary, at least to some extent, indicating that the demonstrative exhibit was meant to "supplement the record" and was simply information being combined in a demonstrative fashion. When asked why this demonstrative exhibit was not used to question Special Agent Bauer, trial counsel indicated it had not been completed on time. The trial court rejected the exhibit, although it was made part of the record for appeal. After the trial court issued its ruling, the State noted that it had not received a copy of the proposed exhibit until 15 minutes prior.

¶ 55    After the trial court issued its ruling regarding the demonstrative exhibit, it addressed some of the matters reserved as part of the earlier jury instruction conference. The court then recessed for lunch. Upon returning, trial counsel asked to address a matter with the court, indicating that he, defendant, and trial counsel's assistant had observed one of the jurors sleeping. The trial court indicated it had made some similar observations but declined to remove the juror at that time. In rebuttal, the State recalled Detective Carley to perfect its impeachment of defendant and Newsome.

¶ 56    In closing, the State utilized the jury instructions to explain what it had to prove to show that defendant was guilty of the murders of Arevalo and Roman, and then argued that it had done so, citing defendant's physical resemblance and similar clothing to the suspect with the hat in the surveillance video, the cell phone data, Arevalo's statements about having a meeting with defendant, defendant's fingerprint on one of the bags of cannabis, defendant's financial difficulties with his vehicle, and defendant's knowledge that Arevalo had been robbed before. The State argued that in order to believe that defendant had not murdered Arevalo and Roman, the jury would have to believe that all of that evidence was a coincidence and defendant was simply unlucky. The State asserted that the jury had been given two different versions of what had occurred on

25

September 4, 2107, one from defendant and one from the State, and the State's was the more compelling of the two.

¶ 57    Trial counsel, by contrast, argued on behalf of defendant that the person shown in the surveillance video was not defendant, indicating that both the video itself and the stipulated statements of Williams indicated that the suspect with the hat was a light-skinned Black man while defendant was darker-complected. He argued that there was no knowing, based on the forensic evidence, when defendant's fingerprint had been left on the bag of cannabis and that it had been left on the bag when Arevalo had sold defendant cannabis earlier in 2017. Trial counsel also asserted that the State's purported motive, that defendant was in financial trouble and needed money, did not fit the facts, as both victims had had large amounts of cash in their pockets that had been left behind. He argued that Bernal was not a believable witness but had instead identified defendant based on pressure from the victims' families to come up with a suspect, while Newsome was far more credible. Trial counsel argued that the cell phone evidence from Special Agent Bauer fit just as well with defendant's explanation of his whereabouts on September 4, 2017, as with State's theory of the case.

¶ 58    In rebuttal, the State reasserted that the jury had been given two different possible versions of events, one in which defendant was not guilty, as he was asserting, or one in which he was guilty, as the State asserted, and that the State had overcome defendant's presumption of innocence, based on its theory being more consistent, better corroborated, and more in line with common sense. The State again went over the evidence it believed to be in its favor, and attacked the credibility of Newsome, comparing it unfavorably to that of Bernal, whom it termed the "corroboration queen of this case." The State argued it was unclear which suspect Williams had described as light-skinned and noted that the color distortion of the video from 517 Harvey could

26

be seen based on the fact that Roman's shirt was black but appeared gray in the video. The State also went into a detailed comparison of the clothes defendant was wearing in his Snapchat photo from September 4, 2017, and the clothing of the suspect with the hat from the surveillance video, pointing out small details it believed that the two shared.

¶ 59     The jury was then instructed by the trial court. Before the jury was sent back to deliberate, however, the trial court dismissed the juror that defense counsel had asserted was sleeping at different points during the trial, replacing him with one of the two alternates. Following the jury leaving the courtroom to begin its deliberations, a conference was held in open court about which exhibits should be sent back with them to assist with their deliberations. Some time later, the jury requested the opportunity to view the surveillance video from 517 Harvey again. The trial court allowed it, bringing the jury into the courtroom to view it.

¶ 60     After the jury viewed the video, the trial court received word that the foreperson was indicating that two of the jurors stated that they did not feel they could continue deliberating. The trial court suggested bringing both jurors into open court to discuss their concerns, and both trial counsel and the State agreed with that process. The trial court inquired with the first juror about her "concerns about proceeding" and she indicated she had heard some "rumors" about the victims the night before. The trial court then clarified that anything she may have heard outside the courtroom was not evidence and should not be considered as part of deliberations. The trial court asked the juror if she believed she could set aside what she had heard and continue deliberating, to which she replied that she did not think she could. The trial court asked why, and the juror indicated that while she knew they were just rumors, based on them, she could not "go the same way everyone else is kind of doing." The trial court then sought to clarify another part of the juror's earlier statements, asking if someone had contacted her. The juror affirmed that someone had,

27

although not "directly" and explained, stating "[t]hey said, I wonder if you're on this case, but it's back from 2017, and da, da, da, da, sa. I kept my mouth shut. I didn't say anything." The trial court again clarified that none of what was said was evidence, and the juror indicated that she understood. When asked again if she could put what she had heard out of her mind when deliberating, the juror responded that she could. The trial court asked both the State and trial counsel whether they had any more questions for the juror, and neither did.

¶ 61    When the trial court inquired of the second juror, she immediately stated, "I've worked through them [her concerns] in my head. I can base it off just the evidence presented." The trial court briefly clarified that assertion and then asked trial counsel and the State if they had any questions, which they did not.

¶ 62    Following those two juror interactions, the jury returned a verdict of guilty to the murders of Arevalo and Roman. Trial counsel requested that the jury be polled, and all jurors answered affirmatively when asked whether those were their verdicts. The jury was then released, defendant's bond was revoked, and the matter set for a sentencing hearing and posttrial motions on April 26, 2023.

¶ 63    On March 23, 2023, defendant filed a *pro se* motion requesting a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), alleging what he asserted were 24 instances of ineffective assistance of counsel, supported by some exhibits in the form of documents related to his prior 2015 conviction, excerpts from the police reports for the murders of Arevalo and Roman, and other discovery materials from the case. On that same date, defendant also filed a motion for a new trial, alleging 18 errors. The motion for a new trial included as an attachment the motion requesting a *Krankel* hearing and its attachments.

¶ 64    On April 26, 2023, the trial court first conducted a *Krankel* hearing as requested by defendant, going through each of defendant's allegations from the motion and asking defendant to explain them. The trial court at times asked trial counsel to comment on defendant's allegations after defendant's statements. The trial court ruled on each allegation discussed before moving on to the next, ruling on some allegations that the court determined had been discussed as part of an earlier one without further argument from defendant. After going though defendant's allegations of ineffective assistance from trial counsel, the court ruled that all were meritless or a matter of trial strategy.

¶ 65    At the conclusion of the *Krankel* hearing, trial counsel requested, and was granted, permission to withdraw from his representation of defendant. The trial court then spoke with defendant about how he wanted to proceed, indicating that if defendant wanted time to hire another attorney or wanted the public defender's office reappointed in the case, that would be allowed. Defendant instead indicated he wished to proceed immediately to a sentencing hearing representing himself, with both the trial court and defendant noting that, at that point, the sentence was mandated by statute.

¶ 66    Defendant's *pro se* motion for a new trial was then addressed, with defendant arguing first, noting that some of the allegations had been covered as part of his allegations of ineffective assistance of counsel, but rehashing some of those issues anyway. The State was then allowed to respond, and the trial court denied the motion, noting that it believed that the evidence in the case to be, in essence, overwhelming.

¶ 67    After addressing defendant's *pro se* motion for a new trial, the trial court again asked defendant how he wanted to proceed, once again offering him the opportunity to be represented by an attorney if he wished. Defendant indicated he was ready to proceed *pro se*.

29

¶ 68    At the sentencing hearing, the State presented no evidence in aggravation. The trial court read the letters defendant had given it in mitigation, and defendant presented no further evidence. Defendant did make a short statement prior to being sentenced, sending his condolences to the victims' families but maintaining his innocence. The trial court sentenced defendant to a mandatory life sentence, again noting the evidence against defendant to be "substantial."

¶ 69    This appeal followed.

¶ 70                              II. ANALYSIS

¶ 71    Defendant raises a total of eight claims of error on appeal. First, defendant alleges that his due process right to a fair trial was denied when the trial court both failed to conduct an adequate inquiry into two jurors who came forward during deliberations indicating they were unable to continue and then failed to declare a mistrial on that same basis. Next, defendant makes two separate claims alleging that the trial court erroneously admitted hearsay statements. The first are those of victim Rafael Arevalo indicating that he was planning to meet with someone around the time of his murder. The second were those of Bernal identifying defendant as one of the subjects depicted in the surveillance video from the home of Arevalo. Defendant further claims error from the trial court allegedly admitting improper other crimes evidence in the form of previously dismissed charges. Defendant also argues that the State improperly shifted the burden of proof during closing statements. Several claims of ineffective assistance of trial counsel were made, and defendant further argues that when he raised those claims with the trial court, he received an inadequate *Krankel* inquiry. Finally, defendant claims that the trial court did not properly admonish defendant before allowing him to represent himself in posttrial proceedings.

¶ 72                                    A. Jurors

¶ 73    Defendant's first claim of error is that his due process right to a fair trial was denied when the trial court failed to either conduct an adequate inquiry or declare a mistrial after two jurors came forward during deliberations indicating they were unable to continue deliberating. During the jury's deliberations, the trial court learned that two jurors felt they could no longer continue as jurors. Upon receiving that information, the trial court called each juror before it to be separately questioned about the basis for that belief.

¶ 74    The first juror indicated that she had "heard some rumors last night about some of the victims, so I just—there was some names thrown around during witness testimony, so I said I would like to know more about this." The trial court responded first by thanking the juror for informing it of what had occurred, then by reminding the juror that anything she heard outside the courtroom was not evidence, and finally by asking whether she could put what she had heard out of her mind and deliberate without regard to it. The juror hesitated, stating she did not think she could, and the trial court inquired further. Eventually, the trial court specifically inquired about whether someone had contacted the juror, to which she responded, "[k]ind of. I mean, they didn't contact me directly. They said, I wonder if you're on this case, but it's back from 2017, and da, da, da, da, sa. I kept my mouth shut. I didn't say anything." The trial court again clarified that what the juror had heard was not evidence and asked if she could put what she heard out of her mind and deliberate based only on evidence heard in the courtroom. At that point the juror indicated she could continue without regard to what she had heard outside the courtroom. The trial court then inquired of both parties to see if they had any follow up questions, and finding that neither did, released the juror to continue deliberating.

¶ 75    The trial court then inquired of the second juror, who immediately indicated that she had "worked through them [her concerns] in my head. I can base it off just the evidence presented." The trial court, after conferring again with the parties, inquired no further and released the second juror to continue deliberating as well.

¶ 76    Defendant argues that these inquiries into the concerns held by these two jurors were inadequate, with the trial court failing to conduct "meaningful follow up" with either of the two jurors at issue or any other jurors to determine the exact extent of any outside communication with any jurors. Defendant argues that instead of ascertaining the relevant details of any communications with jurors, such as who had contacted them, what exactly was said, when the contact occurred or if other jurors had been informed of these communications, the trial court simply reminded the first juror that anything heard outside of the courtroom was not evidence and should not be considered in reaching a verdict. As part of his argument urging reversal based on this inadequate inquiry and failure to remedy the problem of apparently tainted jurors, defendant argues that communications between jurors and third parties regarding the case are presumptively prejudicial and, unless the harmlessness of the communication can be shown, requires reversal.

¶ 77    The State counters that Illinois no longer categorically presumes prejudice based on outside communication with a juror, citing *People v. Ward*, 371 Ill. App. 3d 382 (2007), and that the trial court's inquiry into the concerns of both jurors was sufficient in this matter. The State also argues that by failing to object to the way the trial court questioned the jurors, and by failing to move for a mistrial over the matter during trial, defendant has forfeited this issue. Defendant, however, argues that the issue was not forfeited, as it was raised in his posttrial motions, and that, even if it was forfeited, the matter should be reviewed as plain error.

¶ 78    The Illinois Supreme Court has long held that, "for a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion." *People v. Jackson*, 2022 IL 127256, ¶ 15. "Failure to do so forfeits any review of the error." *Id.* "[A] criminal defendant who fails to object to an error and raise the error in a posttrial motion has forfeited the error, precluding review of the error on appeal." *Id.*

¶ 79    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) allows for the review of forfeited errors, setting out the plain error rule as follows: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule allows for review when one of two prongs are met: "(1) where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence or (2) when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Jackson*, 2022 IL 127256, ¶ 19. "Under both prongs, the defendant has the burden of persuading the court to excuse his forfeiture." *Id.* However, there can be no plain error where there is no error. *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009).

¶ 80    We find that defendant forfeited this issue when trial counsel failed to object to the way the trial court handled the two jurors who came forward indicating they were unable to deliberate. We therefore review this as plain error. Defendant has claimed that both prongs of plain error potentially apply, however, as we find there was no error, plain or otherwise, in the way the trial court handled the issues posed by the two jurors in this matter, we need not go any further in our analysis.

¶ 81    A defendant has a due process right to a fair and impartial jury, with a fair and impartial jury being defined as one " 'capable and willing to decide the case solely on the evidence before

it.' " *People v. Runge*, 234 Ill. 2d 68, 103 (2009) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). The Illinois Supreme Court has acknowledged that there is some question about whether the presumption of prejudice first announced by the United States Supreme Court in *Remmer v. United States*, 347 U.S. 227 (1954), still applies. *Runge*, 234 Ill. 2d at 103. What is clear, however, is that while it is the duty of the trial court to ensure that a defendant is tried by a fair and impartial jury, the trial court retains great discretion in how it handles potential problems up to and including how much to inquire as " 'sometimes less is more' when it comes to judicial investigation of alleged juror misconduct." *Id.* at 103-05 (quoting *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004)); *United States v. Zizzo*, 120 F.3d 1338, 1349 (7th Cir. 1997). Even when the presumption of prejudice regarding third party communication with a juror was clearly in effect, it was, as the term denotes, not conclusive but instead a presumption that could be rebutted. *People v. Harris*, 123 Ill. 2d 113, 132 (1988). Once the presumption was invoked, the burden shifted to the State to establish that the third party contact was harmless to the defendant. *Id.* The ultimate determination of whether a defendant was prejudiced by third party communication with a juror, much like how potential issues implicating whether a juror is fair and impartial should be dealt with, rested in the discretion of the trial court. *Id.*

¶ 82    Here, even if we apply the presumption of prejudice as defendant desires, it is clear that defendant was not prejudiced. Defendant takes issue with the trial court's focus on whether the first juror could disregard anything she might have heard outside of the courtroom. However, this concern goes directly to the definition of a fair and impartial juror: one who is " 'capable and willing to decide the case solely on the evidence before it.' " *Runge*, 234 Ill. 2d at 103 (quoting *Smith*, 455 U.S. at 217). Beyond that, the exchange between the trial court and the juror makes it clear that, while undesirable communication did occur, the juror indicated that person "didn't

contact me directly" and merely "wonder[ed]" whether the juror was hearing the case at issue. The juror then responded appropriately, remaining circumspect, indicating that she "kept my mouth shut" and "didn't say anything." Moreover, the juror asserted that she could be fair and impartial, only taking into account the evidence presented at trial, rather than anything heard outside the courtroom. Taking all of this together, it is clear that there was no prejudice and that even if we were to presume prejudice, that presumption would be rebutted. Furthermore, it is clear that the trial court's inquiry was sufficient as it gathered the information necessary for us to determine that defendant was not prejudiced by the third party communication that occurred with the first juror.

¶ 83    With regard to the second juror, there is no reason to suppose any sort of communication occurred at all, and by the time the trial court spoke to her, whatever reservations or concerns she had were resolved. Given that "sometimes less is more," the level of non-inquiry performed by the trial court was entirely appropriate and defendant was not prejudiced by allowing that juror to continue deliberating. *Runge*, 234 Ill. 2d at 103 (quoting *Peterson*, 385 F.3d at 135); *Zizzo*, 120 F.3d at 1349.

¶ 84    Based on our determination that the trial court performed appropriate inquiries into the two jurors' concerns and that defendant was not prejudiced by the limited communication with the first juror, and therefore that no mistrial was warranted, we determine that no error occurred here. As there was no error, there can be no plain error. Thus, defendant's claims regarding the two jurors who came forward during deliberations fail.

¶ 85                    B. Hearsay Statements

¶ 86    Defendant makes two separate claims that inadmissible hearsay was allowed to taint his trial to such a degree that reversal is required. The first is that the trial court erroneously allowed hearsay statements of Arevalo to be presented at trial pursuant to the hearsay exception allowing

35

statements of then existing state of mind. The second concerns statements regarding Bernal's identifications of defendant as one of the men depicted in the surveillance footage from the victims' home at the time of the murders. We address both of these claims in turn.

¶ 87        1. *Statements by Victim Rafael Arevalo* (*Then Existing State of Mind*)

¶ 88    Prior to trial, the State filed a motion *in limine* asking to admit statements made by Arevalo pursuant to Illinois Rule of Evidence 803(3) (eff. Mar. 24, 2022), "Then Existing Mental, Emotional, or Physical Condition." The statements at issue had been made by Arevalo to family members and Arevalo's boyfriend, indicating that he was planning on meeting with "Carina's boy" and "friends from Champaign." This motion was granted over defendant's objection, and the record reflects a "continuing objection" to the admission of that testimony throughout the proceedings. Now, on appeal, defendant continues to argue these statements, as well as similar social media messages from Arevalo to Bernal, were inadmissible hearsay, indicating that the statements were impermissibly used by the State as substantive proof of the meeting the statements spoke of.

¶ 89    Illinois Rule of Evidence 803(3) allows for the admission of statements, whether or not the declarant is available as a witness, when it is a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including *** a statement of declarant's then existing state of mind, emotion, sensation, or physical condition to prove the state of mind, emotion, sensation, or physical condition of another declarant at that time or at any other time when such state of the other declarant is an issue in the action." In this instance, defendant argues that the use of Arevalo's statements that he was meeting with "Carina's boy" and "friends from Champaign"

36

were impermissibly used by the State to prove defendant's state of mind, rather than Arevalo's, as the State used those statements to argue that defendant and Arevalo did, in fact, meet.

¶ 90    Generally, we review a trial court's evidentiary rulings on an abuse of discretion standard, finding error only when the trial court's decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). However, when the admission of evidence presents a purely legal question, a reviewing court may review the decision *de novo*. *Id.* Issues of statutory interpretation present a question of law, which garners *de novo* review. *People v. Butler*, 2025 IL 130988, ¶ 31. Defendant argues that a *de novo* standard of review should be applied here, as the matter does not involve witness credibility or fact finding, citing *People v. Steele*, 2014 IL App (1st) 121452. Here, we need not determine which standard applies, as under either standard, we find no error by the trial court.

¶ 91    We find defendant's argument that Arevalo's statements were not ones of then existing mental condition unpersuasive. The plain language of Illinois Rule of Evidence 803(3) includes "intent" and "plan" explicitly (Ill. R. Evid. 803(3) (eff. Mar. 24, 2022)), and Arevalo's statements clearly indicated that he intended or planned to meet with someone. In the case of the Snapchat messages with Bernal, those statements explicitly indicated the person Arevalo was meeting with was defendant, with Bernal explicitly asking in that message if Arevalo had gotten in touch with defendant to sell him cannabis. With regard to Arevalo's statements to his family and boyfriend, it was instead merely implied that person was defendant. Courts have previously, even prior to the promulgation of Illinois Rule of Evidence 803(3), upheld the admission of hearsay statements of a murder victim indicating that they planned to meet with a defendant just prior to their murder. See *People v. Herring*, 2018 IL App (1st) 152067; *People v. Jones*, 84 Ill. App. 3d 896 (1980); *People v. Reddock*, 13 Ill. App. 3d 296 (1973). Here, we find the conclusions of one of those courts,

37

the *Herring* court, pertinent; specifically, that that defendant "takes issue not so much with admissibility but with the State extrapolating that the person who burgled the Mustang must be the same person who shot Stephen and Flisk. This was a logical inference: that Stephen and Flisk, who were attempting to find out who burgled the Mustang, were shot by the person trying to escape culpability for the burglary." *Herring*, 2018 IL App (1st) 152067, ¶ 66. Much like the defendant in *Herring*, defendant here takes issue with the inference that a meeting that Arevalo planned actually took place. However, as the *Herring* court noted, "[t]he State may encourage the jury to make reasonable inferences." *Id*. The inference that defendant actually did meet with Arevalo, as he said he was planning to, is certainly reasonable. This inference is especially reasonable, given the other evidence, such as the cell phone evidence and surveillance video, which also supports such a conclusion. We find the trial court did not err in admitting Arevalo's statements regarding his planned meeting, as the statements were statements of then existing mental state under Illinois Rule of Evidence 803(3).

¶ 92        2. *Statements by Carina Bernal* (*Statements of Prior Identification*)

¶ 93    Defendant also takes issue with the admission of statements regarding Bernal's out-of-court statements identifying defendant in the surveillance video from the home of Arevalo at the time of the murder. Defendant alleges that the usual exception allowing such statements, codified both by statute and Illinois Rules of Evidence as a statement of prior identification, does not apply to Bernal's statements because Bernal was not identifying defendant based on having witnessed him in person at the time of the offense. As this question is one of statutory interpretation, we review it *de novo*. *Butler*, 2025 IL 130988, ¶ 31.

¶ 94    Section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12 (West 2022)) allows for the substantive admission of a statement that would otherwise be hearsay when

38

three factors apply: "(a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." Section 115-12 expanded a previously existing hearsay exception codified by the Illinois Supreme Court in *People v. Rogers*, 81 Ill. 2d 571 (1980), by allowing the admission of a declarant's prior statements identifying someone not only to corroborate an in-court identification but as substantive evidence. *People v. Neal*, 2020 IL App (2d) 170356, ¶ 33. Subsequent to the enactment of section 115-12, the Illinois Rules of Evidence further codified the exception by adopting it as Illinois Rule of Evidence 801(d)(1)(B) (eff. Oct. 15, 2015).

¶ 95    The goal of statutory interpretation is to is to give effect to the legislature's intent in promulgating the statute. *In re Christophe K.*, 217 Ill. 2d 348, 364 (2005). The plain language of a statute, when considered as a whole, with all of its relevant parts, is the best indication of that intent. *Id.* When statutory language is clear and unambiguous, other methods of construction or interpretations are unneeded. *Id.*

¶ 96    In arguing that we should find that Bernal's statements should not have been admitted under the auspices of section 115-12, defendant urges us to disregard the Second District Appellate Court's decision in *People v. Neal*, 2020 IL App (2d) 170356, and find that it was wrongly decided, in favor of the reasoning of the Florida Supreme Court in *Ibar v. State*, 938 So. 2d 451 (Fla. 2006). In *Neal*, our colleagues in the Second District decided, as a matter of first impression in this State, whether the language in section 115-12 that "the statement is one of identification of a person made after perceiving him" requires that the person making the statement be a victim or eyewitness, or, in the alternative, whether someone who has seen the accused at some point in the past is sufficient. (Internal quotation marks omitted.) *Neal*, 2020 IL App (2d) 170356, ¶ 32. The

Second District examined both the plain language of the statute and its legislative history. *Id.* ¶¶ 33-38. The legislative history included a brief statement from the sponsor of the bill that became section 115-12 indicating that at least one rationale behind the exception was to allow for identification made closer in time to the offense, when memory was fresher. *Id.* ¶ 34. The *Neal* court decided that it was sufficient, based on the plain language of the statute, for the person making the statement to be one who has seen the accused at some prior point as opposed to requiring that person to be a victim or eyewitness. *Id.* ¶¶ 33-38. More specifically, the *Neal* court found that the statute's language indicating that the statement of identification must be made "after perceiving" the accused, "contains no limitation as to the persons whose prior identifications of a defendant may be admitted into evidence." *Id.* ¶ 36. Having found that the plain language of the statute contained no limitations on how the person being identified was perceived, the *Neal* court declined to read a limitation into the statute confining the statement of identification to one made by a victim or eyewitness. *Id.* Instead, the *Neal* court found that if the policy concerns of the *Ibar* court, such as the potential for what that court termed the "endless repetitions" of prior identifications and the possibility that a defendant would be convicted based solely on an identification made by someone unrelated to the offense on trial, were best left to the legislature or supreme court committee on the rules of evidence. *Id.* ¶¶ 39-46. Having looked at both the *Ibar* and *Neal* decisions, we find the *Neal* court's plain language based approach, outlined above, to be the more persuasive, and adopt it.

¶ 97    Further, in reviewing the decision that first spawned the hearsay exception codified in section 115-12 and *Rogers*, we note that unlike the legislative history the *Neal* court looked to, the *Rogers* court was less concerned with the passage of time between the crime and the identification, and its impact on a witness's memory, than with concerns of an identification being attacked on

40

the basis of recent fabrication. *Rogers*, 81 Ill. 2d at 578-79, *Neal*, 2020 IL App (2d) 170356, ¶ 34. The rationale of the *Rogers* court applies equally to victims, eyewitnesses and any other potential identification witness. When both the statements of the *Rogers* court and the sponsor behind the bill that led to section 115-12's enactment, are taken into account, it would seem that the reasoning behind a hearsay exception allowing statements of prior identification is agnostic as to how the identification witness perceived the accused.

¶ 98 We find *Neal*'s reasoning persuasive, and thus the fact that Bernal was neither a victim nor an eyewitness to the murders is of no matter. Bernal's statements identifying defendant as one of the men depicted in the video from the victims' home were admissible under section 115-14 as statements of prior identification.

¶ 99 Defendant further takes issue with the "circumstances of those identifications and descriptions of Bernal's emotions during the identification process" being admitted. These contentions are not based on any arguments of statutory interpretation and are therefore reviewed for an abuse of discretion. *Caffey*, 205 Ill. 2d at 89.

¶ 100 Regarding the descriptions of Bernal's emotions, defendant appears to specifically take issue with testimony by Prado and Detective Carley. Prado testified that Bernal "gasped" upon initially being shown still photographs from the surveillance footage in Arevalo and Roman's home on the day of the murders and that "she was shocked." Detective Carley testified that when he was initially notified of defendant as a possible suspect, based on the still photographs, he was told by Prado that Bernal would not give the detective defendant's name herself because she "was scared." Detective Carley also testified that he was unable to record the first identification Bernal made, because when he asked to record that interview, she indicated she was scared. Defendant argues that those statements, along with descriptions made by Prado, Detective Carley, and Miriam

41

Rodriguez about how the identifications made by Bernal eventually occurred, were "irrelevant and cumulative," claiming they impermissibly went "beyond the identification itself." In making this latter argument, defendant conflates attempts to impermissibly recount hearsay statements by a witness describing an offense with testimony from witnesses recounting their own observations of what occurred at the time of the identification. See *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 91. Defendant further asserts that Prado's statements are hearsay by arguing that

> "Prado, Rodriguez, and Carley all told the jury about Bernal's prior identifications, the circumstances in which she made the identifications, and described how she was 'scared' and 'shocked.' [Citations.] This testimony from Prado, Rodriguez, and Carley repeating Bernal's identifications was inadmissible hearsay because it went far beyond what was necessary to place Bernal's identification in context for the jury, and the witnesses' detailed accounts improperly bolstered Bernal's identification."

¶ 101    Hearsay, per Illinois Rule of Evidence 801(c) (eff. Oct. 15, 2015) is a "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Here, Prado's challenged testimony references no statements made by Bernal, out of court or otherwise, and certainly does not purport to describe the observed details of the offense itself. Instead, that challenged testimony describes actions Bernal took that were witnessed by Prado and Prado's observations of Bernal's apparent emotional statement. The same is true for the challenged testimony of all three witnesses, Prado, Rodriguez and Detective Carley, simply describing the circumstances and mechanics of Bernal's prior identification. A statement cannot be hearsay where it references no other statements at all and a trial court does not abuse its discretion when it admits such statements.

42

¶ 102    While Detective Carley's statements, at least, do seem to reference statements made to him outside of court—statements by Prado that Bernal was scared and then later statements from Bernal herself refusing a recorded statement for the same reason—those statements are also not hearsay. The context of admission makes it clear that, rather than being admitted for the truth of the matter asserted, both statements were instead simply offered as an explanation for why events took place as they did. The first served to explain why Bernal herself did not initially give police defendant's name as a suspect and the second explained why that interview was not recorded. This sort of usage, while not an actual hearsay exception as hearsay is not implicated, has often been referred to as the "course of investigation" exception. See *People v. Williams*, 181 Ill. 2d 297, 312-13 (1998).

¶ 103    As none of the statements defendant challenges as "irrelevant and cumulative" circumstances of the identification and Bernal's emotions during that process are hearsay, nor does defendant sufficiently state any other basis for their exclusion, his challenges to those statements fail. The admission of Bernal's prior statements of identification and the accompanying statements of Prado, Ramirez, and Detective Carley regarding its circumstances and Bernal's emotions during that process were all proper and the trial court did not abuse its discretion in admitting them.

¶ 104                              C. Aggravated Battery Conviction

¶ 105    Defendant initially alleged on appeal that the trial court erred by admitting the entirety of the certified copy of conviction packet rather than just the aggravated battery conviction that was used as impeachment. In his argument, defendant appears to assume that the full packet for the certified conviction, which included the names and informations for charges dismissed pursuant to the plea for the impeachable prior aggravated battery, was presented to the jury, arguing that the "exhibit presented to the jury contained far more than simply a certified copy of [defendant]'s

43

conviction. Instead, it included the charging documents for all of the allegations brought against [defendant], including several inflammatory charges that did not result in convictions." However, defendant also indicated as part of his argument that if the jury was not made aware of the other dismissed charges, there would have been no error. Specifically, defendant indicated that if, in response to defendant's assertion that he had not been convicted of aggravated battery to a police officer, all that had occurred during trial was the State presenting a certified copy of defendant's prior conviction for aggravated battery to a police officer, and only that charge, to perfect its impeachment, "the impeachment would have been proper."

¶ 106   After oral arguments in this case, the State requested, and was granted, leave to clarify facts pertaining to the admission of the certified copy of conviction. In its motion, the State indicated that it had spoken to one of the two trial attorneys for the State, Assistant Attorney General Daniel Weiler, who indicated that the certified copy of conviction for defendant's aggravated battery conviction, and the copies of the dismissed charges contained within it, was admitted into evidence but never sent back to the jury during deliberations.

¶ 107   A review of the record in this case confirms Assistant Attorney General Weiler's recollection—a full discussion was held on the record about what exhibits should go back to the jury during deliberations and the certified copy of conviction for aggravated battery, with its objected-to copies of dismissed charges, was not among those that both counsel and the trial court agreed would go back to the jury during deliberations. The record similarly makes clear that the exhibit was never published to the jury, but instead was only identified in open court to the jury by Assistant Attorney General Weiler, who stated, "People's Exhibit 53 is a certified copy of conviction, stating that [defendant] in case 2015 CF 136, out of Coles County, on March 2, 2015, was convicted of aggravated batter, harm, peace officer, on—which is a Class 1 felony." The

defendant's claims in this matter are directly rebutted by the record. It is clear that the jury was never made aware of the extraneous information complained of by defendant. Therefore, no possible error occurred.

¶ 108                    D. Burden Shifting During the State's Closing Arguments

¶ 109   Defendant claims that error occurred during his trial because the State shifted the burden of proof during its closing argument when it told the jury that it had a choice between two stories, and that the jury should convict defendant because the State's version of events was the simpler of the two. Defendant argues this is tantamount to telling the jury that he must prove his innocence and that, if he failed to do so, the jury must convict him.

¶ 110   The State argues both that defendant forfeited this argument and that the State never shifted the burden during closing arguments. Defendant admits that he forfeited this issue, but seeks plain error review, asserting both prongs of plain error apply.

¶ 111   Whether a prosecutor's comments in closing argument require reversal involves a two-part inquiry. In the first step, the reviewing court considers closing arguments in their entirety to determine whether the complained-of comments were improper. *People v. Perry*, 224 Ill. 2d 312, 347 (2007); *People v. Wheeler*, 226 Ill. 2d 92, 122-23 (2007). If the prosecutor's comments are deemed improper under the first step, the "reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Perry*, 224 Ill. 2d at 347. In determining if improper remarks require reversal, courts should look to whether they are substantial and constituted a material factor in a defendant's conviction. *Wheeler*, 226 Ill. 2d at 123 (citing *People v. Linscott*, 142 Ill. 2d 22, 28 (1991)).

45

¶ 112   It is well-settled that "[p]rosecutors are afforded wide latitude in closing argument." *Wheeler*, 226 Ill. 2d at 123 (citing *Caffey*, 205 Ill. 2d at 131). Closing arguments should be considered in their entirety, with the challenged remarks being viewed in the context of the rest of the argument, to determine whether the complained-of comments were improper. *Perry*, 224 Ill. 2d at 347; *Wheeler*, 226 Ill. 2d at 122-23. A prosecutor "may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant." *People v. Jackson*, 2020 IL 124112, ¶ 82. They may not, however, misstate the law or the evidence, express personal opinion, present arguments that are intended to inflame the passions of the jury, or improperly shift the burden of proof to the defendant to prove that he is not guilty of the charged offense. *People v. Johnson*, 218 Ill. 2d 125 (2005).

¶ 113   We again note that there can be no plain error where there is no error. *Glasper*, 234 Ill. 2d at 203-04. Thus, as the State did not impermissibly shift the burden of proof during closing arguments, and therefore did not make improper comments, there is no error here and consequently no plain error.

¶ 114   While defendant characterizes the State's argument that "there can only be two possible explanations for the Defendant's role in this bloody massacre. Either as all of the evidence we have presented suggests he is the murderer who kicked off the whole bloody affair, or, and I say this with a gigantic eye roll, he is simply the most unlucky man to ever walk the face of the earth" as burden shifting, we disagree. Certainly, the State did indicate more than once during closing argument that there were two choices, or possibilities, for the jury in the case, but this is not burden shifting. Rather, it is simply an accurate statement of the choice before the jury: either a defendant is guilty or not guilty of the crimes he is charged with committing, and the jury must decide which verdict is the correct one.

46

¶ 115 Moreover, the State never stated, nor so much as inferred, that defendant must prove his innocence. Indeed, during rebuttal, the State explicitly stated, "they don't have to put on a defense. They don't have to do anything. He's presumed innocent." Moreover, during closing, the State spent four out of fifteen pages of transcript going over the propositions instructions, explicitly telling the jury what *it* had to prove and even telling the jury to "definitely hold us to our propositions." That the State needed to prove its case was far more of a theme in the State's closing than the language of two choices that defendant complains of, with the idea that the State must prove its case coming up at least nine times while the presentation of two choices came up roughly three times. Looking at the State's closing in its entirety, it is clear that there was no improper burden shifting and thus no error supporting defendant's claim of plain error.

¶ 116                           E. Ineffective Assistance of Counsel

¶ 117 Defendant next claims that trial counsel was ineffective on a number of bases. Within the argument heading of his brief, defendant claims that trial counsel was ineffective for (1) failing to challenge the admission of Bernal's prior statements of identification; (2) failing to object to statements of Arevalo and Roman prior to their deaths; (3) failing to request "proper jury instructions" limiting how the jury should consider the alleged hearsay statements he complains of; and (4) failing to proffer a rejected exhibit regarding the State's cell phone tower evidence. Defendant then immediately goes on to claim that he was given deficient performance by trial counsel "in ways almost too numerous to catalog" and further alleged another deficiency, claiming trial counsel improperly stipulated to evidence of defendant's prior offenses. Defendant further claims that trial counsel was ineffective for failing to object to other crimes evidence in the form of the prior sale of cannabis between defendant and Arevalo, failing to object to other crimes evidence in the form of Bernal's statements that defendant had borrowed and failed to return a

47

gun, and finally that trial counsel failed to object, ask for a mistrial, or preserve the claim of error with regard to the two jurors who came forward during deliberations indicating they could not continue. In support of these claims, defendant largely references his earlier claims that each of these issues constituted error standing on its own. As we have already discussed, and ruled against, those claims of error, specifically the claims that trial counsel should have requested further inquiry of the two jurors who came forward, or a mistrial based on them coming forward, Arevalo's statements about having a meeting with defendant, Bernal's prior statements of identification and evidence of defendant's prior impeachable conviction for aggravated battery, we need not revisit them.

¶ 118   A claim of ineffective assistances of counsel is analyzed under the two prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant. *Id.* at 687. A defendant must show both deficient performance and prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* In judging counsel's performance and determining whether such performance was deficient, the Court must look at whether counsel's performance "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Id.* at 688. In finding deficiency, there is a "strong" presumption that the challenged action or inaction was the product of sound trial strategy rather than incompetence. *Id.* at 690. Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," with reasonable probability being defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A reviewing court need not first determine that there was deficient performance prior to looking at whether a defendant was prejudiced by any alleged

deficient performance, as failure to meet either prong makes the entire claim fail. *Id.* at 687, 697. Thus, a claim of ineffectiveness may be disposed of based solely on an analysis showing that either prong, deficiency or prejudice, was not met. *Id.*

¶ 119    Here, defendant has asserted what we construe as eight separate claims of ineffective assistance of counsel. We need not address each of these claims individually, however, as we instead choose to dispose of defendant's claims of ineffective assistance of counsel based on the second prong of *Strickland*, finding that the evidence against defendant was so overwhelming that he was not prejudiced, even assuming *arguendo*, that counsel's performance was deficient with regard to the claims we have not previously disposed of.

¶ 120    In this case, there was video evidence supporting the conclusion that defendant was one of the two men who murdered Arevalo and Roman. While the video lacked footage of the kitchen where Arevalo was shot and the night vision nature of the recording in the living room distorted the color, the video did very clearly show a man who looked enough like defendant that a jury could reasonably determine it was defendant even without Bernal's identification going into the kitchen just prior to Arevalo being shot. Additionally, that suspect was wearing clothing similar to that worn by defendant in his Snapchat selfie from the same day. That video also appeared to clearly show that Arevalo was expecting someone to stop by his home that evening, as he approached the front door several times, apparently checking to see if anyone had arrived. It is eminently reasonable to conclude that the person he was waiting on was this defendant, based on (1) his own statements that he was meeting with "Carina's boy" and "friends from Champaign," (2) defendant's statements to Bernal indicating he at one point had plans to meet with Arevalo, and (3) the cell phone tower evidence showing, at the least, that defendant's phone was in Danville around the time of the murders. Defendant's fingerprint was found on a plastic bag containing

49

cannabis from the murder scene and, while defendant denied any involvement in the murders, he did admit to being present in Danville with his phone around the time of the murders and having been in contact with Arevalo trying to arrange another cannabis sale. Given the strength of this evidence, even had defendant's attorney acted as he now desires and (1) ensured the jury been given "proper jury instructions" limiting how the jury could consider alleged hearsay statements, (2) presented his exhibit regarding the cell phone tower evidence, (3) declined to stipulate to the certified copy of defendant's prior conviction, (4) objected to the other crimes evidence of the prior cannabis sale, and (5) objected to the other crimes evidence regarding the gun borrowed from Bernal, there is no "reasonable probability that *** the result of the proceeding would have been different." *Strickland*, 466 U.S at 694. As such, defendant was not prejudiced by any of this alleged ineffective assistance and his claims of ineffective assistance of counsel fail.

¶ 121                                 F. *Krankel* Inquiry

¶ 122    Defendant's penultimate claim of error in this case is that after having raised numerous potentially meritorious claims of error in a *pro se* posttrial filing, the trial court failed to make an adequate inquiry into those claims. Specifically, defendant alleges that while he raised over a dozen potential instances of ineffective assistance of counsel and supported that claim with 22 exhibits, the trial court "conducted only a brief inquiry on [defendant]'s allegations as part of a routine post-trial hearing," in which it "marched through the paragraphs in [defendant]'s *pro se* motion, dismissing nearly all of his contentions as 'trial strategy,' " ultimately labeling the *Krankel* inquiry as "superficial."

¶ 123    When a defendant makes allegations of ineffective assistance of counsel to a trial court, whether those allegations are made in writing, orally, or otherwise, the procedure for how to address those claims is governed by *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny.

50

*People v. Roddis*, 2020 IL 124352, ¶¶ 34-35. Once these allegations are made, the trial court should address them by examining the claims to see whether they lack merit or pertain only to matters of trial strategy. *Id.* ¶ 25. During this examination, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). The trial court may also include in its evaluation of a defendant's claims "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79 If, after this examination, a trial court finds that a defendant's claims do lack merit or pertain only to trial strategy, the claims may be disposed of at that time. *Id*. at 78; *Roddis*, 2020 IL 124352, ¶ 35. If the evaluation shows possible neglect by trial counsel, however, then new counsel should be appointed to represent the defendant at a further adversarial hearing on the defendant's claims of ineffective assistance. *Moore*, 207 Ill. 2d at 78, *Roddis*, 2020 IL 124352, ¶¶ 35-36. Whether a trial court made an adequate examination or inquiry into a defendant's initial claims of ineffective assistance of counsel is reviewed *de novo* while the trial court's actual determination of the merits, or lack thereof, of a defendant's claims is reviewed for manifest error. *Jackson*, 2020 IL 124112, ¶ 98.

¶ 124   Here, defendant claims that the trial court did not give defendant's claims adequate inquiry. However, a review of the record shows the *Krankel* inquiry conducted by the trial court involved an exchange between defendant, trial counsel and the trial court on each of defendant's claims and took up a full 37 pages out of the 73 transcribed on that date. While the trial court certainly devoted more attention to some individual claims than others, the only instances where the trial court did not ask defendant to expand upon his claims, such as defendant's complaints about the admission of Arevalo's statements regarding a meeting with defendant, were issues that the trial court felt to

51

be duplicative of claims where an exchange had already occurred. In this instance, the trial court clearly engaged in the sort of "interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation" contemplated by the *Krankel* case law and did so at length.

¶ 125   In *People v. Williams*, 147 Ill. 2d 173 (1991), our Illinois Supreme Court found adequate an examination of that defendant's claims of ineffective assistance where, rather than engaging in an interchange like the one seen here, the trial court first ruled upon the motion entirely based upon its own observations and only later allowed the defendant to comment upon the allegations. *Id*. at 252. Defense counsel was never asked to comment on the allegations at all. *Id.* The examination engaged in by this trial court was far more extensive than that in *Williams*, and thus clearly passes muster. Defendant was not deprived of an adequate inquiry into his claims of ineffective assistance of counsel and no further inquiry is needed.

¶ 126                       G. *Pro Se* Admonishments

¶ 127   Finally, defendant claims that he received improper admonishments under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), rendering invalid his waiver of his right to counsel, and that, as a result, this matter must be remanded for new posttrial and sentencing proceedings. Indeed, defendant essentially claims an utter lack of such admonishments, stating that the trial court allowed him to proceed *pro se*: (1) "without admonishing Trimble of the nature of the charges against him and the range of punishment or otherwise inquiring with Trimble as Illinois Supreme Court Rule 401(a) requires;" (2) that "[a]t no time, either prior to trial or during the post-trial phase did the trial court admonish Trimble of: the nature of the charges, the minimum and maximum sentence prescribed by law, or the fact that a natural life sentence would be required in this case. [Citations.] Nor did the court ever directly inform Trimble that he had the constitutional right to

52

the appointment of counsel;" and (3) "Trimble was allowed to proceed *pro se* without any Rule 401(a) admonishments after the trial court concluded its preliminary *Krankel* inquiry, despite the fact that the nature of the offense raised the specter of a life sentence for Trimble. Although the trial court briefly discussed Trimble's right to counsel with him at that time, and again prior to moving to the sentencing phase, the trial court never reviewed the charges against him, the potential sentence, or confirmed that Trimble possessed the capacity to knowingly and intelligently waive his rights and represent himself."

¶ 128   A defendant has the right, under the sixth amendment of the United States Constitution, both to representation by an attorney and to eschew such representation and proceed *pro se*. *People v. Wright*, 2017 IL 119561, ¶ 39. In order to proceed *pro se* a defendant must make a knowing, voluntary and intelligent waiver of his right to representation by counsel. *Id.* Governing a trial court's acceptance of that waiver, is Illinois Supreme Court Rule 401(a), which reads as follows:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

While compliance with Rule 401(a) is required for a defendant to make a knowing, voluntary and intelligent waiver, strict compliance is not required. *Id.* Instead, substantial compliance will suffice. *Id.*

¶ 129   To begin, it is unclear, as noted in *People v. Dyas*, 2023 IL App (3d) 220111, ¶¶ 15-17 (*rev'd on other grounds*), whether Rule 401(a) admonishments are required after a case has reached certain stages, such as after the imposition of sentence or after a finding of guilt. In *Dyas*, the Second District Appellate Court found Rule 401 admonishments were still required when a defendant sought, *pro se*, to withdraw his plea of guilty, while the Fourth District Appellate Court had previously decided in *People v. Young*, 341 Ill. App. 3d 379 (2003), that such admonishments were unnecessary as "[i]t would have been useless for the trial court to inform Young of the nature of a charge and the possible sentencing because Young was not facing any charge or possible sentence." *Id.* at 387. In reversing the Second District's decision in *Dyas*, the Illinois Supreme Court declined to exercise its supervisory authority, leaving the matter unresolved. *People v. Dyas*, 2025 IL 130082, ¶ 28.

¶ 130   While defendant in this matter chose to proceed *pro se* after having been convicted at trial and while facing a mandatory life sentence, meaning that under the *Young* Court's logic he likely was not required to be admonished under Rule 401(a), we need not decide today which of our sister courts is the more persuasive, as we find that this defendant was admonished in substantial compliance with Rule 401(a). Following the *Krankel* proceedings outlined previously addressing defendant's claims that trial counsel was ineffective, trial counsel requested and was granted leave to withdraw, at which point the trial court inquired of defendant about how he would like to proceed, specifically asking if he wished for time to hire a new attorney or simply proceed to a

sentencing hearing. At that time, the following exchange occurred between the trial court and defendant:

"THE DEFENDANT: I mean, basically, it's just—I mean, what—I don't.

THE COURT: I'm not trying to talk you into anything. But I think that what you are getting at is the sentence has essentially already been decided. I think you are aware of that.

THE DEFENDANT: Yeah.

THE COURT: As we went over.

However, if you want an opportunity to discuss with another attorney, I'm happy to give you that time to do that. This is a first sentencing hearing. It is a—I mean, it's a big case that involves your rest of your life. If you want an opportunity to hire another attorney to discuss that with, I can give you some time to do that. If you would like the Public Defender's Office appointed just for the opportunity to meet with you and present your—whatever you want at the sentencing hearing, we can do that. If you are wanting to proceed today so that you can get on with the appeal process, we can do that.

THE DEFENDANT: In a sense that is kind of what I kind of want to do. But I did, like, as far as like you said, I'm sure it's already been decided. But I did have, I guess, character witnesses, if that means anything. Do I—I don't know how to present those.

THE COURT: I'm happy to review that. As I think we discussed before you ever went to trial, if you were convicted of multiple first degree murders, the legislature has already determined that it is mandatory life sentence. It almost

55

makes the issue of mitigation and aggravation sort of irrelevant. But that said, again, you want an opportunity to have an attorney meet with you before we proceed to the sentencing hearing, I think this, as I said, a case where you are facing mandatory life sentence, I would be happy to appoint somebody from the Public Defender's Office or give you an opportunity to hire private counsel."

This exchange certainly substantially complies with Rule 401(a). Defendant was specifically told of the nature of the charge, "multiple first degree murders," the minimum and maximum sentence, by then narrowed down to the singular option of mandatory life, and that he had a right to counsel, including to have counsel appointed for him, with the trial court offering more than once to reappoint the public defender. While the trial court in this instance may not have said, "I am going to admonish you in accordance with Illinois Supreme Court Rule 401" or anything similar, the record before us shows substantial compliance. As defendant was properly admonished in accordance with Rule 401, we find that his waiver of his right to counsel was made knowingly, intelligently and voluntarily and reversal for new posttrial proceedings is not warranted.

¶ 131                                III. CONCLUSION

¶ 132   For the foregoing reasons, we affirm the judgment of the Circuit Court of Vermilion County.


¶ 133   Affirmed.

56